Loring-, J.,
delivered the opinion of the court:
The statement of facts shows that this is one of the many cases of contracts for military supplies remaining unperformed at the sudden termination of the war, when the need of the United States for such supplies ceased.
By the burning of the mills in which the cloths contracted for were manufactured, the petitioner was prevented from furnishing them within the time specified in the contract. And that brings up the question whether the time specified was of the essence of the contract when it was made.
By the theory of the common law a contract offers but one alternative, viz, performance or damages; and, therefore, at the common law, time, like every other term of a contract, is essential to it; and the failure of one party to perform in the time specified absolves the other from his obligations under the contract.
*737 And as time is essential in military operations, it is essential in a contract for the means of carrying them on. And the parties in this case knew that the need of the Government for the cloths contracted for grew out of the existing war, and would cease whenever the war ceased. And, therefore, under the rule of law and the circumstances in which the contract was made, we think that the time specified in it for the petitioner’s performance was of the essence of the contract, and that his failure to tender the cloths within that time absolved the United States from their obligation under the contract to receive them.
But the petitioner alleges that after the time specified for his performance in the contract had expired, he was by a verbal agreement with Colonel Perry duly authorized to complete it, and did so, and is therefore entitled to the price he claims. This is the allegation of the petitioner and the burden of its proof belongs to him, and we think the proof is not made with the certainty that would entitle him to judgment.
Where a party to a written contract claims to bind the other,' beyond its terms, upon a few spoken words of his agent, the party claiming should show that the only reasonable inference from the words spoken, and their circumstances, is the meaning and purpose he claims for them. For the written contract establishes one mutual intent between the parties to it, and that must stand till another mutual intent is substituted for it. And if the spoken words are capable of more than one inference, and thus are doubtful, it is incumbent on the party who seeks to use them to ascertain that doubt, which he can always do.
The circumstances of the case are that the petitioner’s contract was made with Colonel Moulton, at Cincinnati, and was to be performed there, in his local jurisdiction and under his official authority. And he was in a position to know the circumstances of the case, which Colonel Perry could only know from the statements of the contractor himself. In such a case the transmission of the petitibner’s application by Colonel Perry to Colonel Moulton for his action, to which it especially belonged, was a propriety so manifest, and so according to military usage, that it, of itself, furnished a presumption that that was Colonel Perry’s intent. And we think the words spoken are consistent with that intent.
The facts are found that, in February, 1865, the petitioner came to Washington and applied to the Quartermaster-General *738 to be released from the unfinished part of his contract; and that he was referred by the Quartermaster-General to Colonel Perry, then Chief of the Bureau of Clothing, &c., at Washington. But this reference was made by the Quartermaster-General without any special directions from him to Colonel Perry. And thus it merely transmitted the petitioner’s application to Colonel Perry, to be disposed of by him in the exercise of his discretion within the limits of his general official authority.
Then Colonel Perry said to the petitioner that there was no power out of Congress to release him from the contract and that he must furnish the goods, and that upon application to Colonel Moulton sufficient time would be allowed him.
In saying that there was no power out of Congress to release the petitioner from his contract and that he must furnish the goods, Colonel Perry only stated correctly the law and its consequences. No statute authorized him to release a contract of the United States, and until the contract was released its terms bound the petitioner. His failure as to time did not release him from such performance as remained, and this it was Colonel Perry’s duty to require. And as to the law and its consequences, it is manifest from the nature of the subject that Colonel Perry was only stating his belief and opinion. And we think that in the rest of the sentence,11 that upon application to Colonel Moulton sufficient time would be allowed to deliver them,” Colonel Perry only meant to express his belief and opinion as to the result of the application he directed, for there is nothing in Colonel Perry’s words that indicates the intent of any action by him, and on the evidence there was no action whatever on the part of Colonel Perry beyond the words spoken to the petitioner, and these expressly referred the petitioner to Colonel Moulton as the means of, and official procedure for, obtaining the extension of time. And these means being express, the petitioner had no reason or right to infer any other, or to extend the words spoken to him, by his own implication, beyond the application to Colonel Moulton, to which he was referred.
Colonel Perry’s reference of the petitioner to Colonel Moulton shows that such application was considered the first step to be taken, and the statement of facts shows that when the petitioner made his application to Colonel Moulton, he referred this extra-official matter of the extension of time and alteration of a con *739 tract to the Quartermaster-General for bis decision. And this it is to bo assumed was the ordinary course of military procedure in so exceptional a case, and therefore what Colonel Perry may be presumed to have contemplated. And as the war was still going on and the need of the cloths continuing, Colonel Perry’s opinion that the cloths would be accepted and his expression of that opinion were incident to the circumstances of the time and the petitioner’s application to him.
And if the words of Colonel Perry are equally capable of the inference we have drawn from them and of that claimed by the petitioner, viz, an absolute undertaking by Colonel Perry on his own sole authority for an extension of time, then the petitioner has not proved his allegation that after the time specified in the contract for his performance he was duly authorized to complete it.
And we think that there is nothing iu the evidence that suggests that the petitioner understood the words of Colonel Perry to be an undertaking for, or grant of, an extension of time then made, or that the petitioner acted on them.
The statement of facts finds that after the petitioner had learned that he could not be released from his contract, he made a new contract for the manufacture of the 77,809 yards' of cloth remaining to be delivered under the contract, at 3¿ cents per yard beyond the contract price, and thus in excess of that by $2,623. But by performance he was to get $25,538, which was the amount then reserved of the contract price on former deliveries. And, moreover, the contract provided that on default of delivery by the petitioner the United States might purchase the cloths in the market, and this would be. much more costly to him than his own procurement of them. And by performance and the acceptance of his cloths he was to escape the liability for damages already incurred and secure the contract price. To perform the contract, which was still binding on him, was, therefore, the course his interests dictated at the time, and then there was no reason to doubt that the cloths would be accepted, and, undoubtedly, if the war had continued they would have been accepted. But the sudden termination of the war altered altogether the position of the parties, and has brought them into litigation here on their strict legal rights. And on those we think the petitioner has not proved the allegation on which he rested his case with sufficient certainty to entitle him to judgment.
*740 But if it were proved that Colonel Perry’s words were intended to make and did make an absolute verbal agreement for an extension of time beyond that specified in the written contract, we think it would be invalid under the statute of 2d Jutte, 1862, which requires contracts for military supplies to be in writing.
The Act June 2, 1862, (12 Stat. L., p. 411,) is a statute of frauds, and as clearly so as the statute of 29 Charles II. Both have the same purpose, viz, the prevention of frauds. Both use the same means, the requirement of writing, and both have the same legislative authority, and both are subject to the same reasons and rules of construction; for in both the object of construction is the same, viz, to ascertain the legislative intent in requiring written evidence.
The rule of the common law which makes parol evidence inadmissible to alter a written contract, results from the classification the common law makes of the different species of evidence, by which the superior in quality is made to prevail over the inferior. But the common law does not seek to prevent parol contracts or to preclude the evidence proper to them, and, therefore, at the common law a written contract may be altered by a subsequent verbal agreement complete and valid in itself, and either altering the terms of the original contract or taking its place.
But the'statute of frauds is a positive enactment, requiring certain contracts to be in writing, for reasons of public policy. And where, like the act of 1862, it requires the contract to be in writing, that means the whole contract, and necessarily excludes any alteration of it, or substitution for it, by a subsequent verbal agreement. Different decisions have been had in different States under their respective statutes, but the rule for courts of the United States in the construction of the statute of frauds, as to its requirement of a writing, has been fixed by the decision of the Supreme Court in Swain v. Seaman, (9 Wall., p. 254.) The contract there was held to be executed between the parties, and, therefore, not within the statute of frauds; but in stating the rules under that, the court said as follows :
u The better opinion is that a written contract, falling within the statute of frauds, cannot be varied by any subsequent agreement of the parties, unless such new agreement is also in writing. Express decision, in the case of Marshall v. Lynn, (6 M. & N., p. 109,) is that the terms of a contract, falling within the *741 operation of the-statute of frauds, cannot be altered or varied by parol; that where a contract for the bargain and sale of goods is made, stating a time for the delivery of them, an agreement upon another day for that purpose must, in order to be valid, be in writing.”
This adoption by the Supreme Court of the. English rule, under the statute of frauds, makes it the rule for us in the case it specifies — that of a verbal agreement to extend the time of performance, specified in a written contract, required by statute to be in writing; and that is the very case on which the petitioner claims. It may be true that the case at bar is not within the English statute of frauds, for it is not merely a contract of sale, but is also for the manufacture as well as the sale of the cloths. But the case is within the statute of June 2,1862, for that in its terms embraces all contracts, and is thus as absolute in its requirement of writing, and in its exclusion of parol evidence, as to all contracts for military supplies, as the statute of frauds is for the contracts it specifies.
And the act of 1862 is much more stringent than the seventeenth section of the statute of frauds, requiring for the sale of goods and merchandise a note or memorandum in writing; for that section provides that the acceptance of part of the goods shall take a contract out of the statute. And under a written contract for the sale of goods, if there has been a delivery and acceptance of part, and thus a part performance, the contract is by that discharged from the statute, and remains only under the common law, at which a subsequent verbal agreement in alteration of, or in substitution for, the original written contract may be valid. But the act of 2d Juue, 1862, makes no provision for an acceptance of a part of the goods, giving validity to the contract, or taking it out of the statute, and therefore it can have no such effect. Its requirement that the contract shall be in writing is unqualified, and it follows necessarily that there can be no alteration of it or substitution for it by any subsequent verbal agreement, for if that is taken as part of the original agreement, then the Avhole of that is not in writing ; and if the subsequent verbal agreement is taken as a new contract, then no part of that is in writing, and is, therefore, invalid under the statute. And in analogy to this and in affirmation of it, it has always been held in England and in this country, under the sections of the statute of frauds as to the sale *742 of lands, promises to pay the debts of another, and promises not to be performed within a year, &c., that as these sections make no provision for part performance, that, if proved, does not take the contract out of the statute or tend to its validity. On. this point all of the decisions have been uniform, and all are authorities that part performance does not take a contract out of the act of 2d June, 1862, or give validity to a verbal contract within its purview. We think it immaterial, therefore, that in this case part of the cloths had been delivered.
And that the Act June 2, 1862, (12 Stat., p. 411,) is a statute of agency as well as a statute of frauds, is no reason why it should not be construed according to the rules established by the Supreme Court for the construction of the statute of frauds; on the contrary, the efficiency of the act of June 2,1862, for its important purposes as a statute of agency, depends upon its being so construed.
. The first section of the act of 2d June, 1862, requires the Secretaries of War and of the Navy and of the Interior to cause every contract made by them, or their officers under them appointed to make contracts, to “ be reduced to writing,'1'1 &c., and filed in the returns office.
The second section requires the officer making such return .to verify it by his oath, under the pains and penalties of perjury.
The third section makes the officer’s omission to make such return a misdemeanor, punishable by fine and imprisonment.
The fourth section establishes a returns office in the Department of the Interior, with clerks and records, and makes copies of the records legal evidence in all prosecutions under the act.
And the fifth section prescribes that every officer appointed to make contracts shall be furnished with a printed letter of instructions, setting forth his duties under the act.
Thus the act establishes a .system for the making in writing and recording, and safe disposition, of contracts made in the Departments of War, of the Navy, and of the Interior. And it is these Departments which make the contracts on which must depend the efficiency of the Army and Navy in peace and in war, and the security oí' our Indian borders. And the purpose of the system is to keep those Departments informed, with reliable certainty, of what provision has been made and what provision is needed to be'made for their operations. And it is manifest that this purpose, as well as the purpose of prevent *743 ing frauds by collusion between officers and contractors, and all other purposes of the statute, would be defeated if quartermasters all over this extended country could alter the written and recorded contracts of the Government by subsequent verbal agreements between themselves and contractors.
Thus the integrity and efficiency of the system require that the act of 1862 should be construed as the statute of frauds is construed in relation to the alteration of written contracts by subsequent parol agreements.
And statutes are not construed by the names they may have acquired in practice, but by their terms, and in reference to the' legislative intent those manifest. And the only reason for the construction fixed upon the statute of frauds is, that its requirement of a note or memorandum in writing is mandatory; and the requirement that the contract shall be in writing is just as mandatory in the statute of 1862. And in case after case, since the enactment of that statute, we have held contracts for supplies invalid because not made in writing.
And if the rules of construction which belong to the statute of frauds are to be applied to the statute of 1862, and the legislative intent of that act is to be taken to be what it requires, that contracts within it must be made in writing, we think it follows as a legal consequence that no officer and no authority in the Government,-short of legislative authority, can make or authorize an alteration of a written contract which is within the act of 1862 by any verbal agreement.
And if the act of 1862 is also a statute of agency, as well as a statute of frauds, then it is to be administered under the law of principal and agent, and by that law an express authority cannot be extended by implication; thus an authority to sell is not an authority to mortgage — an authority to sell on a day stated, at a price stated, is not an authority to agree on the day stated to sell the day after it, at the price stated; and the reason of the rule that an express authority cannot be extended by implication is, that if it could be it would cease to be an express authority, or to effect what that is intended to effect, the security of principals. And if any authority could be in fact and legal effect an express authority, it would seem to be a contract of the United States, written and recorded under statute requirements, and then committed for the supervision of its performance to their officers, who by the law of agency *744 peculiar to the Government can bind it only to the extent of the authority actually given to them.
The learned counsel for the petitioner cited to us the case of Salomon v. The United States, (19 Wall., 17,) appealed from this court. But that case differs widely from this. There the officer of the United States accepted the goods contracted for, when delivered, after the time specified in the contract; and it never has been questioned under the common law or the statute of frauds that delivery and acceptance upon a written or verbal contract, or a written or verbal alteration of either, changed the property in the goods and entitled the seller to his price; for that is the legal effect of delivery and acceptance per se, and the price may be recovered on a quantum meruit, irrespective of the contract, as held by the Supreme Court in Emerson v. Slater, (19 How., 224.)
And the statute of frauds has no application to such a case, for the statute regulates only the terms of a contract, and delivery and acceptance are no part of the terms of a contract, but constitute performance; and that is left to its effect at common law. Where a party to a.contract, written or verbal, accepts goods at the time fixed by it for their delivery, it is performance according to the contract. Where a party accepts the goods before or after the time fixed, it is a performance received by him in accord and satisfaction of the performance stipulated for in the contract. And what the case of Salomon v. The United States decides is that an officer of the United States may effect for them such accord and satisfaction in the circumstances of that case. And there the contract for supplies grew out of the war, and the war was flagrant, and the supplies needed at the time of the delivery and acceptance, and the principal’s,assent, therefore, might be presumed from his interest. But that is a very different case from a verbal agreement to accept the goods at some future time; for what may then be the position and interests of the principal cannot be foreseen. ■
The difference between the two cases is that in this there was a verbal agreement altering a contract required by the statute to be in writing, while in Salomon’s ease there was a performance of the contract by delivery and acceptance, to which the statute did not relate. And in their opinion the Supreme Cou said as follows: “The act of 1862, requiring contracts for military supplies to be in writing, is not infringed *745 by the proper officer having charge of such matter accepting delivery of such supplies after the day stipulated.” This places the decision of the case on the facts of delivery and acceptance, and to the words quoted there were added these: “ Nor is a verbal agreement to extend the time of performance invalid.” This is the rule of the common law as stated in the case of Emerson v. Slater, (22 How., 42,) and counsel had cited that case and its rules, and we think the words quoted refer to a rule of law mooted bj- counsel, but not to a rule under the statute requiring contracts to be in writing.
'And taking together the two cases in the 9th and 19th Wallace, we do not understand them to decide that a verbal alteration of a written contract cannot be made where a statute requises a note or memorandum in writing, and that such verbal alteration may be made where the statute requires the contract to be in writing.
The judgment of the court is that-the petition be dismissed.